*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| In the Matter of the Adoption of | ) |
| | ) Supreme Court No. S-16710 |
| E.H. and J.H. | ) |
| | ) Superior Court Nos. 3AN-15-01485/ |
| | ) 01486 PR (Consolidated) |
| | ) |
| | ) O P I N I O N |
| | ) |
| | ) No. 7316 – November 16, 2018 |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Eric A. Aarseth, Judge.

Appearances: Darryl L. Jones, Law Office of Darryl L. Jones, Palmer, for Appellants Foster Parents. Allison Mendel, Bonnie Calhoun, and John Sherman, Mendel Colbert & Associates, Inc., Anchorage, for Appellees Grandparents. Anna R. Jay, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee State of Alaska, Department of Health & Social Services, Office of Children's Services.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

WINFREE, Justice.

## I.      INTRODUCTION

Two young siblings were removed from their biological parents' home and placed with a foster family. The maternal biological grandparents remained involved in the children's lives and sought to adopt them, as did the foster parents. The grandparents

and foster parents entered into a formal settlement agreement, which was incorporated into the ultimate adoption decree.  Under the agreement the grandparents waived their right to pursue adoption in exchange for several specific guarantees and assurances, including that the foster parents would comply with a visitation agreement and facilitate a relationship between the children and the grandparents.  When the grandparents were later denied post-adoption visitation, they moved to enforce the agreement and then to vacate the adoption.

The superior court vacated the adoption after finding that the foster parents made material misrepresentations throughout the pre-adoption process, including specific misrepresentations about their intent to comply with the visitation and relationship agreement.  The superior court placed the children back in state custody to determine a suitable adoptive placement.  The foster parents appeal, arguing that the grandparents' sole remedy is enforcement of the visitation agreement.  But an adoption may be vacated due to material misrepresentations, and because the adoptive parents do not challenge the court's factual finding that they never intended to comply with the settlement agreement's visitation and relationship provisions, we affirm the superior court's decision vacating the adoption.

## II.     FACTS AND PROCEEDINGS

The Office of Children's Services (OCS) took custody of Simon and Ellie[1] in 2012 after discovering that they were living in unsafe conditions.[2]  Simon was almost

---

[1]     We use pseudonyms to protect the children's privacy.

[2]     *See* AS 47.10.011 (enumerating instances "court may find a child to be a child in need of aid"); CINA Rule 15(f)(1) (empowering court at adjudication to order child in need of aid placed in temporary OCS custody pending disposition).

five and Ellie was only three months old. OCS placed the children with foster parents,[3] with whom the children then resided continuously. The children regularly visited their biological grandparents, including overnight visits, and generally maintained a positive relationship with them.

During the children's foster placement, however, the foster parents and the grandparents did not get along. The foster parents accused the grandparents of violating visitation rules, but OCS dismissed the accusation as unfounded. The grandparents alleged that the foster parents were neglectful caregivers and that they relied on their teenagers to provide for Simon and Ellie. Shortly before OCS petitioned to terminate the biological parents' parental rights,[4] both the foster parents and the grandparents requested to adopt the children.

In 2014, when Simon was seven and Ellie was two-and-a-half years old, their biological parents' parental rights were terminated. Early in the termination trial, the grandparents withdrew their request for placement in exchange for an agreement allowing them to remain in the children's lives. The court approved the foster parents as an adoptive placement for the two children.

Following the termination trial, OCS contracted for an adoption home study to evaluate the foster parents. The home-study writer interviewed the foster parents and other family members residing in their home. Neither foster parent disclosed at that time that their own biological children had experienced or alleged sexual abuse. They represented that they were bonded with Simon and Ellie. Both foster parents expressed

---

[3] *See* AS 47.10.080(c)(1) (authorizing court to commit child in need of aid to OCS custody "for placement in an appropriate setting for a period of time not to exceed two years").

[4] *See* AS 47.10.080(c)(3) (authorizing termination of parental rights to child in need of aid upon satisfaction of statutory conditions).

misgivings whether they could create a safe and satisfactory visitation plan with the grandparents, explaining that "[i]n prior visits, the grandparents had allowed [Simon] and [Ellie] to be unsupervised with the birth parents." The home-study writer also interviewed an OCS caseworker, who stated that she supported adoption by the foster parents but had "some concern that the family may not be supportive of maintaining contact with the maternal grandparents."

In early 2015, before the adoption was finalized, the foster mother reported to OCS that the children's grandfather had inappropriately touched Ellie. Investigators interviewed both Simon and Ellie, neither of whom disclosed any abuse, and the investigators concluded the abuse reports were unsubstantiated. Despite the unsubstantiated allegations, the foster parents agreed to a settlement with the grandparents. The foster parents testified at the settlement conference that they were entering the settlement agreement of their own free will and with the assistance of competent legal counsel. The foster parents later claimed they had been under the impression they were not to notify the grandparents of the unsubstantiated allegations or reference them during negotiations at the settlement conference.

The settlement agreement was ultimately incorporated into the June 2015 adoption decree. The agreement is lengthy and specific in its terms. The grandparents "agreed not to continue to pursue custody and placement of [the children] . . . in exchange for the [foster parents'] guarantees and assurances." Other provisions include that the grandparents "will continue to be considered the children's legal grandparents" and that "[v]isitation between the children [and their grandparents] is an important part of the children's mental health and sense of connection to their biological family and heritage." The agreement additionally provides that "[t]he parties agree to respect each other's roles and importance in the children's lives and to facilitate those relationships and titles."

The agreement states that the grandparents shall have retained and enforceable visitation rights surviving the child protection case and any subsequent adoption or guardianship case. But the agreement provides for an initial two-month suspension of grandparent visitation to "solidify the formal and legal familial bond between the children and the [foster parents]," followed by three months of supervised, therapeutic visits conducted with one of the two therapists named in the order. Following that period of bonding and relationship building, the agreement sets out a highly detailed visitation schedule, with unsupervised visits between the children and their grandparents increasing in frequency and duration over time.

In October 2015 the grandparents moved to reopen the adoption case and enforce the visitation agreement. They sought court intervention after being "denied at least six of their visitations with the children, with no hope of any future visitations without immediate court intervention." The foster parents opposed, and they submitted affidavits detailing their history with the children and negative course of dealing with the grandparents.

In December 2015 the superior court granted the grandparents' motion to reopen the adoption. In March 2016 the grandparents moved to vacate the adoption on the grounds of fraud and misrepresentation. The court held a five-day evidentiary hearing in November.

After the hearing the court found that the foster parents' allegations of sexual abuse by the grandparents were not only unsubstantiated, they also were highly suspect and possibly fabricated. The court found that the foster mother never wanted to enter into the settlement agreement, actively isolated the children from their grandparents, and manipulated therapists to promote her agenda.

The court also found that the foster parents failed to disclose material facts that "were significant to the [grandparents'] decision to waive their right to adopt the

children" and "would have meaningfully affected the opinions of the home study writer, OCS, the [guardian ad litem] and the court." These material facts included: (1) the foster parents' family's "significant history of actual or allegations of sexual abuse"; (2) Simon's "pre-adoptive behavior, that he was not bonding with [his foster mother,] and that he was allegedly hoarding food"; and (3) the foster parents' actual pre-adoptive mind set, which was wholly at odds with their "affirmative promise to support and facilitate the relationship between [the children and their grandparents]." The court emphasized that the foster parents' attempts to "undermine[] and improperly influence[] the reunification process between children and grandparents" were not "merely post-adoption conduct" but rather "a continuation of attitude and conduct that existed pre-adoption, and pre-agreement with [the grandparents]."

The superior court vacated the adoption and reappointed the Office of Public Advocacy as Simon's and Ellie's guardian ad litem and OCS as their legal custodian with the authority to make placement decisions. The court returned the children to their pre-adoptive status as children in need of aid. The court clarified that "[n]othing in this order shall be construed as disapproving the [foster parents'] household for placement and/or adoption"; the order returned the placement decision to OCS's discretion.

The foster parents appeal.

## III. STANDARD OF REVIEW

"Although we review the superior court's factual findings in adoption proceedings for clear error, we review de novo as [a] matter[] of law whether . . . factual findings satisfy the requirements for application of a statute."[5] We also review de novo

---

[5]        *In re Adoption of Hannah L.*, 390 P.3d 1153, 1156 (Alaska 2017) (alterations in original) (quoting *In re Adoption of S.K.L.H.*, 204 P.3d 320, 324-35 (continued...)

the legal validity of an adoption decree,[6] adopting "the rule of law that is most persuasive in light of precedent, reason, and policy."[7]  We have stated:

> When reviewing factual findings we ordinarily will not overturn a trial court's finding based on conflicting evidence, and we will not re-weigh evidence when the record provides clear support for the trial court's ruling; it is the function of the trial court, not of this court, to judge witnesses' credibility and to weigh conflicting evidence.[8]

## IV.  DISCUSSION

An adoption decree is voidable within a year of its entry, but it enjoys a strong "presumption favoring [its] validity."[9]  The policy undergirding the adoption statutes is to hold the parties to the decree's terms "except under limited circumstances."[10]  "[C]onfusion, mistake about the finality of the agreement, and a 'change of heart' are generally insufficient grounds to invalidate consent to an adoption."[11]  So too are post-decree disputes about visitation rights and "the boundaries

---

[5]      (...continued) (Alaska 2009)).

[6]      *See S.K.L.H.*, 204 P.3d at 324-25.

[7]      *State, Dep't of Health & Soc. Servs., Office of Children's Servs. v. Michelle P.*, 411 P.3d 576, 581-82 (Alaska 2018) (quoting *S.B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 61 P.3d 6, 10 (Alaska 2002)).

[8]      *Hannah L.*, 390 P.3d at 1156 (quoting *S.K.L.H.*, 204 P.3d at 325).

[9]      *S.K.L.H.*, 204 P.3d at 325 (citing *Holt v. Powell*, 420 P.2d 468, 470 (Alaska 1966)).

[10]      *Id.*

[11]      *Id.* at 327.

of a biological parent's relationship with an adopted child."[12] Although "adoption statutes generally are 'to be liberally construed to the end that the best interests of adopted children are promoted,' "[13] we have held "the best interests of a child cannot alone overcome a valid consent and previously entered adoption decree."[14]

Notwithstanding this strong presumption of validity, a party may seek to void an adoption decree due to "fraud, misrepresentation, failure to give any required notice, or lack of jurisdiction of the parties or of the subject matter."[15] Although AS 25.23.140(b) prohibits any party from challenging an adoption decree after one year on any ground, including fraud and misrepresentation, we clarified in *In re Adoption of S.K.L.H.* that such defenses, as well as defenses not specifically listed in the statute, may be brought before the one-year period expires.[16] A party seeking to vacate an adoption decree on the ground of misrepresentation must establish the existence of: "(1) a misrepresentation; (2) which was fraudulent *or* material; (3) which induced the party to enter the contract; (4) upon which the party was justified in relying."[17] A fraudulent or

---

[12] *Id.*

[13] *Id.* (quoting AS 25.23.005).

[14] *Id.* at 328.

[15] *See* AS 25.23.140(b). To vacate an adoption, the challenger must "show by a preponderance of the evidence that the decree is not valid." Alaska Adpt. R. 17(a).

[16] 204 P.3d at 326.

[17] *See Seybert v. Cominco Alaska Expl.*, 182 P.3d 1079, 1094 (Alaska 2008); *See S.K.L.H.*, 204 P.3d at 328 n.39 (emphasis in original) (citing *Seybert*, 182 P.3d at 1094); RESTATEMENT (SECOND) OF CONTRACTS § 164(1) (1981) ("If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.").

material misrepresentation may constitute sufficient grounds for vacating an adoption decree if the misrepresentation induced the consent of a party required to consent to the adoption under AS 25.23.040(a)[18] or if it induced the assent of a party to a settlement agreement incorporated into the adoption decree.[19]

We note that it is unnecessary to demonstrate multiple misrepresentations to vacate an adoption decree — one will suffice. The foster parents do not dispute the superior court's finding that they misrepresented their intent to facilitate a relationship between the grandparents and the children.[20] They instead rely on their argument that an adoption cannot be challenged for failure to comply with a grandparent visitation agreement, asserting that the superior court erred by vacating the adoption instead of enforcing the visitation agreement.[21]

---

[18] *See S.K.L.H.*, 204 P.3d at 331-32 (holding that superior court erred by vacating adoption decree because adopted child's biological mother had not established existence of misrepresentation which vitiated her adoption consent).

[19] *Cf. Old Harbor Native Corp. v. Afognak Joint Venture*, 30 P.3d 101, 105 (Alaska 2001) (citations omitted) ("Settlement agreements and releases are contracts; as such, they are susceptible to attack under the legal theories of mistake, fraud, and misrepresentation.").

[20] In the foster parents' opening brief, they do not deny their intent to reduce contact between the children and their grandparents; the foster parents instead contend they had valid reasons for going forward with the adoption and hiding their intent at the time. Only in their reply brief do they contest the court's factual findings, stating that they *did* intend to abide by the decree's visitation provisions. But an argument superficially raised for the first time in a reply brief cannot be considered on appeal. *Manning v. State, Dep't of Fish & Game*, 420 P.3d 1270, 1279 n.51, 1280-81 (Alaska 2018). This argument is thus waived. *See Maines v. Kenworth Alaska, Inc.*, 155 P.3d 318, 326 (Alaska 2007).

[21] The foster parents also challenge OCS's right to participate in this appeal in support of the grandparents' position. The foster parents assert that because OCS
(continued...)

We defer to the superior court's undisputed finding that the foster parents misrepresented their intent to abide by the settlement's visitation and relationship provisions. As for the foster parents' legal argument, they are mistaken. The foster parents cite section 3-707(c) of the Uniform Adoption Act, which provides that "[t]he validity of a decree of adoption issued under this [Act] may not be challenged for failure to comply with an agreement for visitation or communication with an adoptee."[22] The Act's commentary clarifies:

> [A]n agreement for post-adoption visitation or communication, while not prohibited . . . has no effect on the fundamental consequence of an adoption, which is to terminate the parental relationship between the child and the former parents and to create the relationship of parent and child in all respects between the adoptive parents and the adopted child.[23]

The foster parents assert that the grandparents' rights to visitation arise under AS 25.20.065 and, because the grandparents may petition the court for enforcement

---

[21] (...continued) never substantively argued the issues below or joined the grandparents' petition to reopen the adoption, OCS failed to preserve its arguments and "knowingly waived any right to participate." It is true that OCS did not take a position on these issues in the superior court. But OCS, as the children's legal custodian, has a keen interest in the resolution of the appeal on their behalf. OCS has not raised any new facts that are not in the record, and its legal arguments are closely related to the grandparents' legal arguments. The foster parents have had a full and fair opportunity to respond to OCS's arguments, and we conclude that the foster parents are not prejudiced by OCS's participation in this appeal.

[22] UNIF. ADOPTION ACT § 3-707(c) (1994).

[23] UNIF. ADOPTION ACT, § 1-105 cmt. (1994).

under that statute,[24] they cannot ask to vacate the adoption for failure to comply with the visitation agreement.

Alaska has adopted a modified version of the Uniform Adoption Act, and our decisions are informed, though not controlled, by the Act and its commentary.[25] Like the Uniform Adoption Act, AS 25.23.130 states that "a final decree of adoption" has the effect of "terminat[ing] all legal relationships between the adopted person and the natural parents and other relatives of that adopted person."[26] But the statute also provides that "[n]othing in this chapter prohibits an adoption that allows visitation between the adopted person and that person's natural parents or other relatives."[27]

In *S.K.L.H.* we considered section 3-707(c) of the Uniform Adoption Act in the context of a superior court ruling that a mother's consent to an open adoption decree was invalid due to her "mistake" about the extent of visitation and her post-adoption relationship with the child.[28] We reversed the superior court's ruling, holding that the mother's alleged mistake was insufficient to invalidate the adoption because the decree's visitation provision, though lacking in detail, was unambiguous, and "confusion, mistake about the finality of the agreement, and a 'change of heart' are

---

[24]    *See* AS 25.20.065(a) (providing "a child's grandparent may petition the superior court for an order establishing reasonable rights of visitation between the grandparent and child" after an adoption).

[25]    *See, e.g.*, *S.K.L.H.*, 204 P.3d at 327 n.28; *In re Adoption of Keith M.W.*, 79 P.3d 623, 628 n.42, 633 (Alaska 2003).

[26]    *Compare* AS 25.23.130(a)(1), *with* UNIF. ADOPTION ACT § 1-105 cmt. (1994).

[27]    *Compare* AS 25.23.130(c), *with* UNIF. ADOPTION ACT § 3-707(c) (1994).

[28]    *S.K.L.H.*, 204 P.3d at 327.

generally insufficient grounds to invalidate consent to an adoption."[29] Given that there was no ground for finding a "mistake" during the decree's negotiation process — i.e., the mother's consent was valid — we characterized the mother's claim as a "post-decree dispute" about the visitation details and shared our agreement with the Uniform Adoption Act that this "cannot be grounds to set aside an adoption decree."[30] Our interpretation of the Uniform Adoption Act and resulting conclusion in *S.K.L.H.* in no way preclude a superior court from vacating an adoption due to a pre-decree misrepresentation about visitation. Our *S.K.L.H.* decision did not turn on the specific topic of visitation, but rather on the particular facts of the mother's purported "mistake," which, due to the agreement's lack of ambiguity, more closely resembled a change of heart and was insufficient to invalidate her consent.[31]

Unlike in *S.K.L.H.*, in this case the superior court found that the foster parents had materially misrepresented their intent to facilitate visitation and the grandparents' relationship with the children, thus invalidating the grandparents' assent to the settlement agreement incorporated into the adoption decree. The court made clear that the foster parents' effort to "undermine[] and improperly influence[] the reunification process between children and grandparents" was not "merely post-adoption conduct" but rather was "a continuation of attitude and conduct that existed pre-adoption, and pre-agreement with [the grandparents]." Because the foster parents do not challenge the court's finding that they misrepresented their intent to abide by the agreement's visitation provisions — an essential premise upon which the grandparents gave up their

---

[29] *Id.*

[30] *Id.*

[31] *Id.* at 326-27.

own right to pursue adoption of the children — and because it is not error to vacate an adoption on this basis, we affirm the court's decision.

## V.    CONCLUSION

The superior court's decision to vacate the adoption is AFFIRMED.