NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

LISA B., )
)
Appellant, )
)
v. )
)
STATE OF ALASKA, DEPARTMENT )
OF HEALTH & SOCIAL SERVICES, )
OFFICE OF CHILDREN'S SERVICES, )
)
Appellee. )
)
_____ )

Supreme Court No. S-18034

Superior Court No. 3AN-18-00602 CN

<u>MEMORANDUM OPINION
AND JUDGMENT</u>*

No. 1879 – March 2, 2022

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Peter R. Ramgren, Judge.

Appearances: Justin N. Gillette, Assistant Public Defender, and Samantha Cherot, Public Defender, Anchorage, for Appellant. Katherine Demarest, Assistant Attorney General, Anchorage, and Treg R. Taylor, Attorney General, Juneau, for Appellee. Laura Hartz, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Winfree, Chief Justice, Maassen, Carney, and Borghesan, Justices. [Henderson, Justice not participating.]

_____

\* Entered under Alaska Appellate Rule 214.

## I.    INTRODUCTION

The Office of Children's Services (OCS) took emergency custody of an Indian child[1] after his mother was arrested. Approximately two years later, the superior court terminated the mother's parental rights. She appeals, arguing that OCS failed to make active efforts to reunify her with her child. Because the superior court did not err by finding that OCS made active efforts, we affirm its order terminating the mother's parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Lisa[2] has a long history of substance abuse, as well as a long history of involvement with OCS. She began abusing substances as a teenager, and despite participation in many substance abuse treatment programs, she has continued to abuse them as an adult. She has been convicted of a number of crimes related to her substance abuse, including two felony convictions for driving under the influence.[3]

Jacob is Lisa's fourth child. Her oldest child was raised by a family member. OCS began receiving reports of neglect due to Lisa's substance abuse after her second child was born in 2009. Lisa completed a substance abuse treatment program in 2011, but she relapsed in 2012 while pregnant with her third child.

---

[1]    25 U.S.C.A. § 1903 (4) (Under the Indian Child Welfare Act (ICWA) an " 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe").

[2]    We use pseudonyms to protect the family's privacy.

[3]    *See* AS 28.35.030(n) (making driving under the influence a felony offense if person has been previously convicted two or more times since January 1, 1996, and within 10 years of offense).

In 2014 OCS removed both of Lisa's children after receiving reports of her substance abuse, mental health problems, and neglect of the children. Over the next several years Lisa participated in several treatment programs but relapsed after each one. In 2018 the superior court granted OCS's petition to terminate Lisa's parental rights to one child and ordered OCS to release custody of the other child to his father.

We subsequently reversed the termination of Lisa's parental rights.[4] Although we did not specifically address Lisa's argument that OCS had failed to make active efforts in that case, we noted that we found "no error in . . . the court's decision on [the] issue . . . ."[5]

Jacob was born in December 2017. In November 2018 Lisa's neighbor called the police after Lisa abruptly left young Jacob with her. Lisa was arrested on an outstanding warrant and OCS assumed emergency custody of Jacob. OCS filed an emergency petition to adjudicate Jacob in need of aid and award OCS temporary custody. The petition detailed Lisa's leaving Jacob with the neighbor, her subsequent arrest, and OCS's history of involvement with Lisa and her children. The superior court granted OCS temporary custody.

The assigned OCS caseworker visited Lisa in jail the next day. The caseworker advised Lisa that Jacob had been placed with a relative. She also asked Lisa for a hair follicle test and information about Jacob's father. Lisa declined to participate in the test or provide any information about Jacob's father. She also declined the offer of visits with Jacob because she did not want him brought to the jail.

---

[4] *Oliver N. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 444 P.3d 171, 173 (Alaska 2019) (reversing termination because expert witness did not meet ICWA's statutory requirements).

[5] *Id.* at 180 n.46 ("Lisa also argues the court . . . erred in finding that active efforts had been made. We see no error . . . .").

Lisa was incarcerated for four months. During that time the caseworker met with her three times. Lisa did not discuss her case plan with the caseworker, and the caseworker did not refer Lisa to any programs available in the prison. The caseworker enrolled Jacob in Head Start and arranged for an evaluation with the Program for Infants and Children.[6] And with the help of Jacob's tribe, OCS placed him with a different relative after the first relative was unable to care for him.

Lisa met with the caseworker in April 2019 after she was released from prison. They drafted a case plan requiring Lisa to work toward three goals: maintain a sober lifestyle, manage her emotional and mental health, and develop healthy relationships. The caseworker discussed specific classes and resources with Lisa, and Lisa provided releases of information to obtain collateral information for referrals to providers. The caseworker, however, failed to make any referrals.

Between April and September the caseworker met with Lisa four times. Lisa also picked up bus passes from OCS and visited Jacob once. She did not attend a second visit that was scheduled in August.

In early September 2019 Lisa went to the emergency room, complaining that she felt bugs crawling under her skin and behind her wisdom teeth. A urinalysis revealed that she had amphetamine in her urine. The caseworker subsequently referred Lisa again to substance abuse treatment.

Lisa picked up a bus pass at OCS a few weeks later, but by early November the caseworker was unable to contact her. Lisa was arrested in mid-November for domestic violence and violating her release conditions from the earlier case.

---

[6] The Program for Infants and Children provides services for children who have developmental delays or disabilities. THE PROGRAMS FOR INFANTS & CHILDREN, INC., https://www.picak.org, (last visited Feb. 2, 2022).

In early December the caseworker tried to visit Lisa but was denied entry to the prison. Lisa was released shortly afterward; the caseworker tried to reach Lisa by phone and left a message when she did not answer. The caseworker reached Lisa at the end of December and scheduled a meeting in January. After the January meeting, the caseworker made two attempts to reach Lisa by phone, but was unable to reach her.

The police took Lisa to the emergency room in January 2020, after finding her under the influence of drugs and underdressed for the weather. She was admitted for psychiatric evaluation. While at the hospital Lisa informed staff that she was not interested in treatment and intended to continue using methamphetamine.

OCS filed a petition to terminate Lisa's parental rights to Jacob in April. The caseworker contacted Lisa in May and told her the date of the next hearing. Two days later Lisa was arrested and charged with burglary and trespass. Lisa remained incarcerated until September 1.

A new caseworker was assigned in early January 2021. That caseworker checked VINELink — an online database that lists incarcerated individuals — and determined that Lisa was not incarcerated. She left a message for Lisa at the phone number OCS had, and contacted Lisa's attorney and her mother. The caseworker confirmed again in February that Lisa was not incarcerated. She was unable to contact Lisa before the termination trial began in January.

**B.    Termination Proceedings**

The court held a termination trial over a few days in January and February 2021. Neither Lisa nor the first caseworker attended the termination trial. Although Lisa's attorney objected, the court considered the caseworker's earlier testimony from

the adjudication trial.[7] OCS presented several witnesses, including the OCS supervisor, the caseworker assigned at the time of trial, Jacob's foster mother, and an "expert"[8] under the Indian Child Welfare Act (ICWA).[9] The supervisor testified about her own efforts in the case. She recounted being involved in "a lot of communication" with Jacob's tribe about a case plan. And after talking to the tribe, she authorized an adoptive home study for Jacob's foster home after the permanency goal changed from reunification to adoption. She also testified about the efforts made by the first caseworker, although she noted those efforts were not well documented in the file.

The second caseworker detailed her fruitless attempts to contact Lisa after she was assigned to the case. Jacob's foster mother testified that Lisa had not seen Jacob in nearly two years.

OCS's final witness was an ICWA expert. He testified that Lisa's substance abuse and mental health issues were likely to cause Jacob physical and emotional damage if he were returned to her care, because Lisa's life was "pretty extreme

---

[7]     *See D.M. v. State, Div. of Fam. & Youth Servs.*, 995 P.2d 205, 209 (Alaska 2000) (allowing the superior court to "review the evidence offered at the adjudication hearing, and, applying the stricter proof standard, make supplemental findings satisfying the requirements for termination.").

[8]     25 U.S.C. § 1912(f) (requiring "qualified expert witnesses" in ICWA termination proceeding); 25 C.F.R. § 23.122(a) ("A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe.").

[9]     25 U.S.C. §§ 1901-1963. ICWA establishes "minimum Federal standards for the removal of Indian children from their families and [for] the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

chaos." After reviewing OCS records, Lisa's mental health and police records, and court documents from Lisa's children's previous cases, the expert opined that "there's nothing OCS [could do] . . . that's going to change [Lisa's] conduct and behavior."

The superior court issued its termination decision on the record several weeks after trial. The court found Jacob a child in need of aid due to Lisa's abandonment,[10] neglect[11] and substance abuse.[12] It found clear and convincing evidence that OCS had "made active efforts to provide remedial services" to prevent the break up of Lisa's family, and listed specific efforts made by both caseworkers, including drafting and meeting about case plans, offering visits, obtaining releases of information to tailor services to Lisa's and Jacob's needs, working with the tribe to find foster homes, and efforts to locate Lisa and engage her in services. The court specifically took note of "the time periods . . . [OCS] had little or no contact with [Lisa]."

The court then found OCS had proved beyond a reasonable doubt that returning Jacob to Lisa was likely to lead to serious emotional and physical damage to Jacob. And in light of the lack of change in Lisa's behavior and circumstances, the court found that termination of her parental rights was in Jacob's best interest. The court followed its oral decision with a written termination order.

Lisa appeals the termination of her parental rights arguing that OCS failed to make active efforts to reunify her with Jacob.

---

[10] AS 47.10.011(1) (providing that a child is in need of aid if the parent "has abandoned the child").

[11] AS 47.10.011(9) (providing that a child is in need of aid if "conduct or conditions created by parent . . . have subjected the child . . . to neglect").

[12] AS 47.10.011(10) (providing that a child is in need of aid if the parent's "ability to parent has been substantially impaired by the addictive or habitual use of an intoxicant . . . [which] has resulted in substantial risk of harm to the child.").

## III.   STANDARD OF REVIEW

"We review the content of the superior court's findings for clear error, but we review de novo whether those findings satisfy the requirements of the CINA rules and ICWA."[13] "Factual findings are clearly erroneous if a review of the entire record in the light most favorable to the prevailing party leaves us with a definite and firm conviction that a mistake has been made."[14] "[W]e will ordinarily not overturn a superior court's findings based on conflicting evidence."[15]

## IV.   DISCUSSION

The superior court found clear and convincing evidence that OCS had "made active efforts to provide remedial services to enable the safe return of the child." The court explicitly acknowledged, as did OCS's attorney, that there were periods when OCS "could very well be found to not have made active efforts."

Relying on *Walker E. v. State, Department of Health & Social Services, Office of Children's Services*[16] the court observed that such periods did not "necessarily negate the overall active efforts." It then found that, particularly in light of Lisa's "long history of refusing treatment, and continuing to refuse treatment and continuing to fail to interact" with OCS, OCS had made active efforts.

---

[13]   *Sam M. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 442 P.3d 731, 736 (Alaska 2019) (quoting *Philip J. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 314 P.3d 518, 526 (Alaska 2013)).

[14]   *Marcia V. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 201 P.3d 496, 502 (Alaska 2009).

[15]   *Id.* (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[16]   480 P.3d 598 (Alaska 2021).

The court listed the efforts it considered. They included case plans, meetings, visitation for Lisa and her mother (in which Lisa rarely participated), offers of transportation, releases of information for substance abuse and mental health services, placing Jacob with relatives, repeated efforts to contact Lisa, and referrals to treatment providers. The court also relied on OCS's efforts to work with Lisa's tribe.

Although both the court's oral findings and subsequent written order provide little detail, they are adequate for our review.[17] Lisa's history of refusing to work with OCS to improve her ability to raise her children stretches over seven years. And her clear statement that she intended to continue to use substances — to medical providers following her emergency hospitalization for substance abuse — showed that Lisa was unwilling to address the substance abuse issues that had caused Jacob to be in need of aid. We have previously approved trial courts' consideration of such extreme

---

[17] But we again remind trial courts of their obligation to make findings adequate for our meaningful review. *See, e.g., In re Adoption of Hannah L.*, 390 P.3d 1153, 1157 n.16 (Alaska 2017) ("[T]he superior court must provide findings sufficient to give a clear understanding of the grounds upon which it reached its decision." (quoting *Price v. Eastham*, 128 P.3d 725, 727 (Alaska 2006))); *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 139 (Alaska 1997) (stating that findings supporting custody decision "must either give us a clear indication of the factors which the superior court considered important in exercising its discretion or allow us to glean from the record what considerations were involved").

lack of cooperation when determining whether OCS's efforts were active.[18] The superior court did not err when it found that OCS made active efforts.[19]

## V.   CONCLUSION

We AFFIRM the superior court's order terminating Lisa's parental rights.

---

[18]   *See Wilson W. v. State, Off. Of Child.'s Servs.*, 185 P.3d 94, 101-02 (Alaska 2008) (excusing further active efforts after father repeatedly threatened to kill caseworker); *Ronald H. v. State, Dep't of Health & Soc. Servs., Off. of Child.'s Servs.*, 490 P.3d 357, 366-67 (Alaska 2021) (finding active efforts despite limitations caused by father's aggressive behavior which included disrupting other families' visits at OCS office and taking photographs of his children holding signs stating that they had been kidnapped during visits at OCS which he later posted to social media).

[19]   Lisa also compares her case to *Bill S. v. State, Department of Health & Social Services, Office of Children's Services* and argues that OCS failed to document its efforts as required by ICWA and termination should be reversed on that basis. 436 P. 3d 976, 982-84 (Alaska 2019) (citing 25 C.F.R. § 23.120(b) ("Active efforts must be documented in detail in the record.")). OCS's documentation in this case far surpassed the "vague testimony" from the caseworker in *Bill S.* The superior court did not err by finding that OCS had adequately documented its efforts.